## PACIFIC MUT. LIFE INS. CO. OF CALIFORNIA v. DAVIN.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1925.)

No. 2330.

Insurance ⬅︎349(1)—Policy held lapsed for nonpayment of premium.

A provision of a life policy that, on default in payment of a premium, the policy should lapse, and, in the absence of other election by insured, the cash surrender value, less any indebtedness of insured to the company, should be applied as a premium to pay for extended insurance in the amount of the face of the policy, less any such indebtedness, *held* valid, and where, when a premium became due and was not paid, insured was indebted on a note given for a prior premium which, with interest, exceeded the surrender value, the policy automatically terminated on expiration of the time of grace allowed for payment of the premium.

In Error to the District Court of the United States for the Southern District of West Virginia, at Huntington; George W. McClintic, Judge.

Action at law by John W. Davin, administrator of the estate of William J. Quinn, deceased, against the Pacific Mutual Life Insurance Company of California. Judgment for plaintiff, and defendant brings error. Reversed.

Douglas W. Brown, of Huntington, W. Va. (Fitzpatrick, Brown & Davis, of Huntington, W. Va., on the brief), for plaintiff in error.

Connor Hall, of Huntington, W. Va. (Deegan & Hall, of Huntington, W. Va., on the brief), for defendant in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. This is a suit against the Pacific Mutual Life Insurance

Company of California, plaintiff in error, brought by the defendant in error, John W. Davis, as administrator of William J. Quinn, deceased, suing for his own use and benefit as such administrator and for Andrew J. Dalton and John A. Kelly, upon a policy of insurance, issued by the plaintiff in error, upon the life of Quinn. Dalton and Kelly were creditors of the deceased for something over $9,000, and as security for their debt he had, during his lifetime, assigned the policy to them.

For clearness and brevity, the plaintiff in error, the defendant in error, the deceased, and Dalton and Kelly, will be referred to as the company, the administrator, the insured, and the assignees, respectively.

While the trial below was to a jury, no issue of fact was there, or is here, in dispute as was recognized by each party moving for a directed verdict in its favor and asking for no other instructions.

On the 2d of June, 1920, the company issued to the insured, who was then 26 years old, the policy sued on. It was for $25,000, and the annual premium upon it was $420, payable annually in advance on the 2d day of June of each year. The premium for the first year was paid in cash at the time the policy was issued, and on the 2d of June, 1921, the second premium was met in like manner. The third premium fell due on June 2, 1922. No payment was then made on it, but on the 1st of August of that year the company accepted from the insured his promissory note payable on September 2, 1922, for $437.50, with interest at 6 per cent. from June 2, 1922. The amount of the note covered not only the premium on his life insurance policy, but an additional sum of $17.50 as premium on an accident annexed to it. By the terms of the policy, either party could terminate the accident provision, and with it, the right to receive and the obligation to pay $17.50 of the amount promised and subsequently it was terminated, but after the $17.50 included in the note had been earned by the company. This note was not paid at maturity, and, indeed, nothing was done as to it until the 2d day of January, 1923, when the company received $35 on its account reducing the amount then due upon it, principal and interest, to $417.81. It is stated that this payment was made by the assignees for the purpose of reducing the amount due on the note below the cash surrender value of the policy so that the company could safely continue the policy in force for a while longer.

On June 2, 1923, another premium of $420

fell due. It was not paid and no payment was ever made on the note except the $35 already mentioned. On the 2d of June, 1923, the amount owed the company on the note, principal and interest, was $428.27, and the premium due in advance on that day amounted to $420 more. The cash surrender value of the policy was then $425, so exclusive of the premium due June 2, 1923, the deceased then owed the company $3.27 more than the amount of its then cash surrender value. The insured died on May 13, 1924, without he or anybody else having made further payments on account of the note or the policy, or, indeed, without anybody, so far as the record discloses, having since January 2, 1923, communicated with the company concerning it. The company regarded the policy as having lapsed months before the death of the insured. The administrator contended that the policy was in force at the time of the insured's death, and that he was entitled to collect the face of it less the sum due on the note, and the premium overdue since June 2, 1923, with interest on the balance, making $24,850.82. The court agreed with the administrator and instructed a verdict accordingly.

The company bases its claim that the policy had lapsed before the death of the insured upon certain provisions of it. They in substance provide that upon default in the payment of a premium, the company was to be under no liability except such, if any, as was set forth in certain paragraphs of the policy headed "Nonforfeiture and Automatic Nonforfeiture." By those provisions, the insured was given the right to elect within three months after the default in payment of the premium, but not later, any one of three options with the further provision that in the event of no such election, the insurance was to be automatically continued as provided in option three. The insured made no election, nor did any one for him, so that his rights under the policy are governed solely by option 3, which reads: "That the insurance for the face amount of this policy, less any indebtedness thereon to the company, will be continued in force from date of default for such term as is hereinafter provided, but without the right to loans." It defines cash surrender value as "equal to the entire reserve on the face amount of this policy, computed according to the American Experience Mortality Table and interest at the rate of 3½ per cent. per annum. Any indebtedness hereon shall be deducted from the cash surrender value." "The amount of the paid-up life insurance, or the term of the

paid-up term insurance, shall be such as the amount of the cash surrender value reduced by the amount of any indebtedness thereon to the company will purchase or buy, as the net single premium at the attained age of the insured based on the American Experience Mortality Table, and interest at the rate of 3½ per cent. per annum."

Now, the note of the insured had been given for the third annual premium. If it had been paid, as it was not, the cash surrender value on June 2, 1923, of the policy would have been $425, which would have bought extended term insurance for 2 years and 50 days; but there was an indebtedness, and that indebtedness exceeded, by $3.27, the amount of the cash surrender value. The provision is clear that the policy was to be continued for only such term as the amount of the cash surrender value reduced by the amount of any indebtedness, due on the policy, would purchase. There was nothing with which to buy any extended insurance whatever, so that the policy automatically terminated at the end of the 31 days' grace given by its terms; that is, at the close of July 3, 1923. So the company then assumed, and still insists.

The administrator says that even if the provisions of the policy relied on by the company are valid and are to receive the construction which the company puts upon them, nevertheless the policy was still in force, because it provides that failure to repay a loan or interest thereon "shall not avoid this policy unless the total indebtedness thereon to the company shall exceed the cash surrender value at the time of such failure, nor until thirty-one days after notice of such fact shall have been mailed by the company to the last known address of the insured and of the assignee, if any, from the home office of the company." It is admitted that no notice of forfeiture for the nonpayment of the note was ever sent, nor was any required. The policy was not forfeited for the nonpayment of the note. What happened was that the premium fell due on the 2d of June, 1923. It was not paid at that time, nor during the 31 days of grace. Entirely irrespective of whether a note was outstanding or not, the insured had the right to elect any one of the three options given him by the policy, and upon his failure so to elect, automatically the policy for itself elected the third option, and then for the first time the fact that he owed any money on the note properly entered into consideration. His policy was to be extended for such time as could be paid for by the cash surrender value

after all indebtedness due by him was deducted from it. It so happened that when the indebtedness due by him was deducted from the cash surrender value of his policy, the result was a minus quantity, and he was not entitled to any extension at all. This is a very different situation from that contemplated by the policy provision relied on by the administrator.

The main stress of the latter's argument to sustain the judgment below, however, rests upon his contention that option 3 does not appear to mean what the company says it does mean, and being ambiguous, the ambiguity must be resolved against the company; secondly, even if it is to be construed as meaning what the company says it does, it is so unfair as to be invalid. We can see nothing uncertain in the provision. To us, it seems perfectly clear. It says in effect that when the option No. 3 is chosen by the insured or automatically comes into force because of his failure to elect either of the others, certain things shall happen. From the cash surrender value of his policy at the time shall be deducted the amount of any indebtedness he owed the company. The balance shall be used in buying for him insurance in the amount of the face of his policy less the indebtedness he owed the company for such length of time as at his age, in accordance with certain definitely described tables, the balance is sufficient to pay. This is perfectly clear, and it means just what it says, and it cannot be understood as meaning anything else.

It is to be remembered that the policy is forfeited for nonpayment of premium, or would be, except for the provision in it with which we are now concerned. In the absence of statute, the parties may agree for whatever grace, be it great or small, the company may be willing to give and the assured is willing to accept. It is a pure matter of contract. Moreover, whether the company shall agree that the extended term insurance shall be for the amount of the face of the policy, or for an amount less than the face, does no harm to the insured. The provision is that he is to get paid-up term insurance for so long as the net amount to the credit of his cash reserve will suffice to pay. That is to say, if the face of his policy was $20,000 and he owed the company $10,000 and the amount to the credit of its cash reserve would presumably buy paid-up term insurance for $20,000 for one-half the time, it would buy it for $10,000, so that whatever the insured lost in the amount of the paid-up policy he gained in the length of time during which it

would be in force. The provision made by the company is more favorable to the insured than is required by the statute law of West Virginia. Barnes Code, chapter 34, § 34 A.

It is said, however, that in this way the company received a double payment of its indebtedness: First, by deducting the indebtedness from the cash reserve; and, second, by again deducting it from the face of the policy as has already been pointed out. Deduction from the face of the policy is an altogether immaterial matter, for, as already pointed out, what the insured loses in the amount of the policy he gains in the time for which it is extended. Quite obviously, for the protection of the company, it must deduct any indebtedness due the company from the cash reserve before it can apply the cash reserve to buying extended insurance, for if it did not do so, the insured would get insurance for which he had not paid, and for which, if he did not happen to die, within the period of extension, he never would pay and never could be compelled to pay.

What we have said disposes of the further contention of the administrator that in some way the company is charging the insured upwards of 6 per cent. on his loan. It is doing nothing of the kind. There is no foundation that we can see for this contention. In accordance with the plan agreed upon between the company and himself when he took the policy, the net cash reserve is used to buy its ordinary value in extended term insurance in the manner prescribed in the policy, and that is all there is to it.

It follows that the learned court below should have instructed the jury to find for the company and not for the administrator.

Reversed.