## MASSACHUSETTS MUT. LIFE INS. CO. v. JONES.

### No. 3006.

Circuit Court of Appeals, Fourth Circuit.

Oct. 21, 1930.

J. M. Woods, of Charleston, W. Va. (Price, Smith & Spillman, of Charleston, W. Va., on the brief), for appellant.

W. W. Goldsmith, of Beckley, W. Va. (Ashton File and File, Goldsmith & Scherer, all of Beckley, W. Va., on the brief), for appellee.

Before PARKER, Circuit Judge, and GRONER and ERNEST F. COCHRAN, District Judges.

GRONER, District Judge.

This is an action at law on a policy of insurance for $5,000 issued by the appellant—defendant below—on the life of James L. Jones, the husband of Jean Jones, the appellee—plaintiff below. The District Court, on stipulation waiving a jury, gave judgment, without opinion, against the insurance company. For brevity, we will speak of the parties as the beneficiary, the company, and the insured.

In December, 1923, insured made application to the company for a twenty payment life policy for $5,000, naming his wife as beneficiary. The policy was issued on the 30th of December, 1923, and contained the stand-

ard options, and also provided two classes of loans; i. e., cash, equal to the amount of the net cash surrender value, and the so-called "automatic premium loan." Insured, in his written application for the policy, selected the latter, and, under the nonforfeiture provisions of the policy, selected "extended term insurance." On the 30th of December, 1923, when the policy was delivered to him, he paid the premium of $168.50, and this was all the out-of-pocket money he ever paid on account of the policy. Shortly after the expiration of the first year, but within the thirty-one days' grace allowed under the policy, he notified the company of his inability to pay the second premium, but inquired, if he should ever be able to pay it, what steps he should take to that end. The company replied that, the cash value of the policy being sufficient for the purpose, it would lend him the money to pay the second year's premium, and had him execute a premium loan note for the amount advanced. When the third premium fell due, Jones owed the company the amount of the second premium, less the dividend declared December 30, 1925, plus interest. He again stated he had no money with which to pay the premium, and the company again informed him there was sufficient value to his policy on which to base an additional loan for enough to pay the premium for that year, and sent him a premium note and agreement for his signature. Insured did not sign or return the note, and paid nothing either in reduction of his former debt or on account of the premium then due, whereupon the company, on the last day of the grace period, applied so much of the cash or loan value of the policy as was necessary to the payment of the third year's premium, and forwarded to insured its receipt therefor. On December 30, 1926, the fourth annual premium became due, and on January 31, 1927, the last day of grace, remained unpaid. Whereupon the company, having determined the then precise cash value of the policy, and having ascertained that the net amount available in cash or for loans was less than the *annual* or *semiannual* premium, made a further loan of a sufficient amount to continue the policy for *a quarter* of a year, and again forwarded to insured its receipt, and notified him that the policy would be continued at face, less the amount of the loans, only to the end of the quarter, viz., to March 30, 1927, and for thirty-one days thereafter. Prior to March 30th insured was again notified that a second quarterly premium would then be due, but again made no reply, nor did he pay the premium. On the last named date

insured's indebtedness to the company, principal and interest, amounted to $324.80, and the cash value of the policy to $340.88. The difference was $16.08, which was not sufficient to pay another quarterly premium, and this amount the company, under the nonforfeiture provision, applied to the purchase of extended insurance, and notified insured of what it had done, and of the expiration date of the extended insurance, which was August 23, 1927. Insured died April 14, 1928.

The grounds upon which the beneficiary claimed the right to recover were: First, that when, on the expiration of the grace period in January, 1927, it was ascertained that the cash value of the policy, less the indebtedness, was not sufficient to support a loan for enough to pay an annual premium, the company, in the absence of a written request from insured, instead of applying the amount available to the payment of a quarterly premium and, at the expiration of the quarter, the balance to extended insurance, should have applied the whole amount to the purchase of extended insurance, and she says that, if this had been done, it would have extended the life of the policy to a period beyond January, 1928, and the dividend, which in that case would have accrued on account of the extended policy as of the 30th of December, 1927, used for the same purpose, would have further extended it some eight or ten days beyond insured's death. Secondly, that in computing the period of extended insurance, the company should not have deducted from the cash surrender value of the policy insured's indebtedness to it, but that his indebtedness should have been deducted only from the face of the policy, and that the tabular cash surrender value, without deduction, should have been the criterion in the purchase of extended insurance, the effect of which would have been to extend the policy for about eight years from that date. And, finally, beneficiary insists that, even if it be conceded that the application of the cash surrender value of the policy to the quarterly payment premium and extension insurance was properly made as against insured, it would not bind her, because she, as beneficiary, did not consent to the loan.

■ We are unable to agree in any of these contentions. In his application for the policy, insured selected the automatic premium loan provision, which bound the company, upon his written request, to loan the amount of the unpaid premium, or the largest installment of premium, not less than a quarter

year, which the cash value of the policy, together with any unpaid dividends, less any indebtedness, was sufficient for. When the policy was delivered to him on December 30, 1923, he paid the first premium in cash. When the next premium became due, he borrowed from the company to pay it. When the third premium became due, he neither paid nor promised to pay, and the company, acting under the impulse of the automatic feature, again advanced the premium for another year. On the due date of the fourth premium, he again failed to pay, and, as the then cash value of the policy was not sufficient to pay an entire year's premium, the company, as we think it was obliged to do, made a further loan of enough to pay a quarterly premium, and at the end of that period, including the thirty-one days of grace, used the residue to provide extended insurance for such period as it would purchase. Beneficiary now insists that, because, when the loan for the quarterly payment was made, insured had not made a formal written request for the loan, the company was under no obligation and had no legal right to make the loan, but that it was its duty to declare the original policy lapsed, and to apply the accumulated cash value, then and there, to the purchase of extended insurance, but this we think is a strained conclusion. Rather we think a fair construction of the policy requires us to hold that the company, in accepting insured's application, in which he specifically indicated his purpose to have the automatic loan provisions apply, agreed to loan the amount of any defaulted premium, when there was a cash reserve sufficient for that purpose, and we think the use of the word "automatically" in the loan provision imposed a duty to make such a loan whenever such a contingency arose, and that without regard to whether another written request was made. This was the construction the company itself put upon the contract, and, in making payments for insured without additional requests in writing, it, in each instance, notified insured of its action, and furnished him with its receipt accordingly. The effect of its doing so was to continue the life of the policy, and this was precisely what insured intended to happen in his selection of the automatic provision. If insured had then and there repudiated this action, and had demanded the appropriation of the available sum on either occasion to the purchase of extended insurance, another question might arise, but he did nothing of the sort, but, with full knowledge of the compa-ny's interpretation of the contract, and its action thereunder, accepted the benefits which the action taken conferred, and, upon natural principles of equity, is bound by his own acquiescence in the company's construction of the contract as fully as if he had himself initiated the program, and, by the same token, his beneficiary likewise is estopped to complain.

Nor are we any more impressed with the argument that the indebtedness of insured to the company for advances made by it to him from the cash value of the policy to pay premiums should not have been charged against the cash surrender value in ascertaining the amount of extended insurance which insured, after default in the premium, was entitled to. There is nothing in the policy, nor is there anything in the statute of West Virginia (Code, c. 34, § 34a (4), or in the statute of Massachusetts (G. L. c. 175, § 144) which would make available for this purpose the gross cash value of the policy. On the contrary, both the policy and the statutes contemplate the appropriation for the purpose mentioned of only so much of the cash value as remains after deducting the indebtedness of the insured to the insurer. If, at the time in question, insured had elected to surrender the policy and receive the cash value in money, the amount he would have been entitled to was the cash value, less the amount of his debt, and this amount, and no more, was the sum available for the exercise of the other options under the policy. The advances made by the company in the payment of defaulted premiums constituted a debt which under the contract became a lien on the policy. When, therefore, the automatic nonforfeiture feature of the policy became applicable, the amount of the indebtedness was deductible both from the face of the policy and from the available cash reserve, for in no other way could a statement of account between the insured and the insurer be made, and we so held in Pacific Mutual Life Insurance Co. of California v. Davin, 5 F.(2d) 481, 484, where, speaking through Judge Rose, we said:

"It is said, however, that in this way the company received a double payment of its indebtedness: First, by deducting the indebtedness from the cash reserve; and, second, by again deducting it from the face of the policy as has already been pointed out. Deduction from the face of the policy is an altogether immaterial matter, for, as already pointed out, what the insured loses in the amount of the policy he gains in the time for

which it is extended. Quite obviously, for the protection of the company, it must deduct any indebtedness due the company from the cash reserve before it can apply the cash reserve to buying extended insurance, for if it did not do so, the insured would get insurance for which he had not paid, and for which, if he did not happen to die, within the period of extension, he never would pay and never could be compelled to pay."

See, also, 4 Cooley's Briefs (2d Ed.) p. 3819.

We have carefully examined the cases cited by plaintiff on this point, but we see no reason to depart from the conclusions announced in the case from which we have quoted.

From what has just been said, it is not necessary to pass upon the question whether the dividend on the extended policy which would have been available on the 30th of December, 1927, provided the available cash as of the date of the conversion was sufficient to extend the life of the policy to that period, would automatically have operated to further increase the life of the policy, since, as has been pointed out, upon no proper theory could the policy have been continued as extended insurance to the date of that dividend. But, even if this were otherwise, it is clear to us the dividend then payable would not have extended the life of the policy. When the form of the policy was changed, and when, by operation of its terms and the application of the available cash, it was extended to a definite period, it became a fixed and definite contract both as to amount and as to time. The original contract was modified and circumscribed by the new contract as to the date of termination, and, in the old contract, as in the new, there was no option to use an accruing dividend to purchase further extended insurance. Such dividends, by the language of the policy, are payable only in cash, or in reduction of premiums, or for paid-up additional insurance, and there is nothing in the nature of an extended term insurance policy to which a dividend subsequently declared could apply in extending the life of the policy.

Upon a review of the whole case, we are of opinion that the District Court erred in giving judgment for the plaintiff, and for this error the case is remanded for a new trial not inconsistent with this opinion.

Reversed.