## MOORE v. PILOT LIFE INS. CO.
### No. 4093.

Circuit Court of Appeals, Fourth Circuit.
Nov. 9, 1936.

E. M. Blythe and P. A. Bonham, both of Greenville, S. C. (Joseph A. Patla, of Asheville, N. C., on the brief), for appellant.

C. F. Haynsworth, of Greenville, S. C., and C. R. Wharton, of Greensboro, N. C. (H. J. Haynsworth and F. D. Rainey, both of Greenville, S. C., on the brief), for appellee.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

SOPER, Circuit Judge.

The administratrix of the estate of David W. Moore, Jr., brought suit to reinstate and recover upon a policy of life insurance upon the life of the decedent, claiming that through the fraudulent misrepresentation and concealment of the Pilot Insurance Company, the insurer, the policy had been surrendered to it and canceled during the life time of the insured. The policy was in fact surrendered to the company for its cash surrender value on March 14, 1934, and on June 21, 1934, the insured was accidently shot and killed. The policy contained a double indemnity clause effective in case of death from bodily injury through external, violent, and accidental means, and suit was brought in the state court for the sum of $20,000, double the face of the policy, and also for the sum of $10,000 as damages for fraudulent breach of the contract. Having been removed to the federal court, the case was tried at law before a jury, and at the conclusion of the evidence, the court directed a verdict for the defendant, being of the opinion that no fraudulent misrepresentation or concealment on its part had been shown. This appeal followed.

The policy was issued at the instance of David W. Moore, the father of the insured, on March 21, 1921, when the insured was a college student not quite twenty-one years of age. The insured neither possessed nor saw the policy at any time, but there was no evidence that the company had knowledge of this fact. After a lapse of two years, to wit, on March 13, 1923 the father borrowed $9,000 from the company, and in order to secure repayment of the loan gave a mortgage on certain real estate and delivered to the company the insurance policy with an assignment thereof, executed by the son. It was expressly stated in the assignment that the policy was assigned to secure the payment of the mortgage and the mortgage note, and power was given to the assignee in case of default to surrender the policy and receive the cash surrender value thereof. The premiums on the policy were paid by the father for three or four years, and later by the son, with the aid during the last two years before cancellation of other members of the family. On April 10, 1929, the father borrowed an additional $6,500 from the company and, in order to secure it, delivered a mortgage on other real estate. Later, to wit, on October 19, 1933, the son executed a second assignment of his insurance policy as collateral security for the payment of the second loan.

Financial reverses overtook the family in 1929 and subsequent years, and it became difficult to keep up the payment on the mortgages and on the insurance policy as they became due. Accordingly, Mrs. Mary Louise Guthrie, the eldest daughter of David W. Moore, had certain correspondence with the company and thereafter, on October 1, 1933, called at its offices in Greensboro, N. C., and conferred with the chairman of the board of directors and the treasurer. During this conference, the incident occurred which gave rise to the charge of fraud. Mrs. Guthrie explained that her father had had a breakdown and that his children had agreed to take care of his indebtedness to the company, but that it was impossible for them to do so under the existing arrangement. The treasurer suggested that the company might agree to a plan for flat monthly payments to cover amongst other things such expenses as fire insurance and taxes on the real estate and premiums on the life insurance policy. The treasurer also suggested that the life insurance policy be dropped and its cash value applied to the reduction of the loans. Mrs. Guthrie rejected this idea, saying that the policy represented the life savings of her brother who then had a wife and child and needed the policy for their protection. The treasurer replied that "this would be the only thing to do, but would suggest the monthly plan to the Board of Directors and would advise of the decision of the Directors." Upon this quoted statement, the charge of fraudulent representation is based.

Subsequently a monthly payment of $150 was agreed upon, but it was discovered that the father had placed a second mortgage on one of the properties and that repairs were needed on the other, and Mrs. Guthrie suggested that the company take a second mortgage on the property first mentioned, so as to provide funds to take care of these items. The company refused, but agreed to pay the taxes for 1933 and add the amount thereof to its loan, and to waive the monthly payment for December, 1933, suggesting that the insured execute a second assignment of the policy which, as we have seen, was accordingly done. Subsequently a reduction in the January payment of 1934 was allowed by the company.

On January 27, 1934, Mrs. Guthrie wrote the company that the insured had found it impossible to make premium payments on the policy which was then being carried by his brother and sister, and that he therefore requested that the cash surrender value of the same, amounting to approximately $2,152.56 be applied to a reduction of the loans. In reply the company, expressing regret that it had been found impossible to continue the policy, inclosed a release thereof to be executed by the insured, and after some delay the release was executed and forwarded to the company which canceled the policy on March 14, 1934, and applied the cash surrender value thereof to the principal of one of the loans.

The policy provides that after three years' premiums shall have been paid in full, if default shall be made in the payment of any subsequent premium, the policy will be entitled to one of three nonforfeiture privileges designated as cash surrender value, paid-up insurance, and automatic extended insurance. Upon surrender of the policy to the company within thirty-one days after the date of the premium in default, the insured may receive the cash surrender value for each $1,000 of insurance set out in an annexed table; or in lieu thereof, provided there is no prior indebtedness thereon, the insured may elect to have the policy continued as paid-up insurance for a reduced amount designated in the annexed table according to the number of years' premiums paid; or if no election of paid-up insurance or cash value is made by the insured, the insurance is automatically continued from the date of default as term insurance for the period indicated in the annexed table according to the number of years' premiums paid. If the policy is so continued, it may be surrendered at any time for its full reserve value at the time of surrender.

It is expressly stated, however, that the table, setting out the cash surrender value, paid-up insurance, and extended insurance for each $1,000 of insurance, is conditioned upon there being no indebtedness upon the policy, and the following provision with regard to indebtedness is also set out: "*Indebtedness reduces the values of the above options:* Any indebtedness to the company existing at the time of default in premium payment, shall be deducted from the full Cash Surrender Value, and the amount of Extended Term Insurance or Paid up Insurance, granted in such case, shall be reduced in the proportion such indebtedness bears to the full Cash Surrender Value."

The theory of the appellant is that the officials of the company must have realized from the circumstances surrounding Mrs. Guthrie's visit that neither she nor her brother were aware of the contents of the policy then in the custody of the company under the assignments; that the officials thereupon became charged with the duty to advise her of the terms of the instrument so that she would know of the option to take extended term insurance and keep the policy alive rather than to surrender it upon payment of its cash value; that ignoring this duty and acting for the advantage of the insurer and to the detriment of the insured, the officials falsely stated that the only thing to do was to drop the policy and apply its cash value to the loans, whereas in truth if the insured had exercised no option, the policy would have been automatically extended and the beneficiaries protected. It is suggested that a fiduciary relationship existed between the parties which required the application of the doctrine of uberrimae fidei under which, when an insurance contract is in the making, either party in possession of information material to the risk is bound to disclose it to the other.

We do not think that the facts disclosed the existence of a fiduciary relationship between the parties during the period when the transactions described occurred. It is well settled, of course, that the exercise of the utmost good faith is required of parties about to enter into an insurance contract, and that the suppression of a material fact which a party is bound in good faith to disclose is equivalent to a false representation. Stipcich v. Metropolitan Life Ins. Co., 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895; New York Life Ins. Co. v. Gay (C.C.A.) 36 F.(2d) 634. But the general rule is that the relation between the parties to an executed contract of insurance is that of one contracting party to another contracting party rather than that of trustee and cestui que trust. Couch's Enc. of Ins.Law, vol. 1, 489 and cases cited; Equitable Life Assurance Soc. v. Brown, 213 U.S. 25, 29 S.Ct. 404, 53 L.Ed. 682; Potts v. Temperance Life Assurance Co. (1892) 23 Ont.Rep. 73. Moreover, in the pending case there is no evidence of bad faith on the part of the

company either in fact or in law. Although the policy was in the possession of the company, its representatives had no reason to believe that the insured was unaware of its contents, and if an inspection of it had been desired, the terms of the instrument would doubtless have been disclosed as was later done upon Mrs. Guthrie's request after her brother's death. Nor is there ground for the contention that the company was acting for its own benefit and against the interest of the insured when the surrender of the policy for cash was suggested in the fall of 1933. No one could then forsee the untimely death of a man less than thirty-five years of age, or that the company would benefit from the surrender rather than the extension of the policy. On the surface, it would seem that the company preferred extended term insurance in case of default, since the policy provided that such insurance should go into effect automatically if the insured should fail to exercise a choice. But it is obvious, when the nature of the business is considered, that the options available to the insured upon default after the payment of three years premiums, as shown by the table in the policy, were equivalent one to the other, each being based upon the cash reserve to the credit of the policy, and that it was a matter of indifference to the company which of the alternatives the insured would choose.

The whole transaction indicated a willingness on the part of the company to co-operate with the family of the insured to save their property and the insurance policy rather than a purpose to injure or defraud. If any other defense to the charge of fraud is needed, it is found in the fact that the company instead of enforcing its right to apply the cash surrender value to the reduction of the debts, suggested and put into effect the monthly payment plan to accommodate the family of the insured; and if it be suggested that when the new arrangement was made the loans were not in default so as to authorize the insurer to cancel the policy and apply its value to the reduction of the debts, the answer is that Mrs. Guthrie had announced to the company that the family was unable to carry the loans or the policy, and it was manifest that the company need only await the inevitable in order to foreclose upon the collateral.

In view of the nature of the complaint, we have discussed the evidence at some length and upon the assumption of the appellant that the treasurer of the company was wrong in his statement to the insured's sister that the only thing to do in case of his default upon the policy was to take its cash value; but it is clear from an examination of the policy that the statement was quite correct. There was only one thing that the insured could do in case he was unable to carry the policy, that is, surrender it and apply its cash value to the payment of the loan, for the policy plainly provided that the value of the options was reduced by indebtedness, that is, the indebtedness was to be deducted from the cash surrender value and the amount of extended term insurance or paid up insurance available in any case was reduced in the proportion that the indebtedness should bear to the cash surrender value. In other words, only so much paid-up or extended term insurance was to be granted as the excess of cash value over indebtedness would buy; and as the indebtedness in this case exceeded the cash surrender value, no extended term insurance or paid up insurance was purchasable. It is of course immaterial that the indebtedness was owing by the insured's father and not by himself, since it became a lien upon the policy through assignments voluntarily made by the insured.

A similar holding was made by this court in Pacific Mut. Life Ins. Co. v. Davin, 5 F.(2d) 481, at page 484, where Judge Rose said: "Quite obviously, for the protection of the company, it must deduct any indebtedness due the company from the cash reserve before it can apply the cash reserve to buying extended insurance, for if it did not do so, the insured would get insurance for which he had not paid, and for which, if he did not happen to die, within the period of extension, he never would pay and never could be compelled to pay."

See, also, Massachusetts Mutual Life Ins. Co. v. Jones (C.C.A.) 44 F.(2d) 540, 542; Moss v. Aetna Life Ins. Co. (C.C. A.) 73 F.(2d) 339, 340.

Affirmed.