**NEW ENGLAND MUT. LIFE INS. CO. OF BOSTON, MASS., v. OLIN.**

No. 7152.

Circuit Court of Appeals, Seventh Circuit.

July 15, 1940.

Rehearing Denied Sept. 25, 1940.

Herman L. Ridenour, of Indianapolis, Ind., for appellant.

Clair McTurnan, William R. Higgins, Lawrence H. Hinds, and James P. Robinson, all of Indianapolis, Ind., for appellee.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

This case involves an insurance policy on the life of Walter G. Olin, deceased. The plaintiff is the New England Mutual Life Insurance Company of Boston, Massachusetts, and the defendant is Martha H. Olin as administratrix of the estate of Walter G. Olin (beneficiary under the policy). In its complaint the plaintiff sought a judgment declaring that the policy had lapsed and terminated before the insured's death. In her counterclaim to the complaint the defendant sought a coercive judgment for the face amount of the policy less indebtedness thereon, claiming that extended insurance available at the lapsing of the policy continued the insurer's liability thereafter until a date beyond the insured's death. The District Court rendered judgment for the plaintiff—for the plaintiff on the complaint and against the defendant on the counterclaim—and from this judgment the defendant appealed.

The plaintiff is a Massachusetts corporation and does business in Indiana, operating an office at Indianapolis through a general agent. In September of 1922 this general agent visited Walter G. Olin, resident of Indianapolis, and his solicitation resulted in Olin executing a written application for an insurance policy. The application recited that "the insurance applied for shall not take effect unless and until this application is approved by the Company and the first premium is paid

while I am in good health." In this connection, to the question in the application reading "Have you paid the first premium on the policy hereby applied for?" Olin answered "No."

The application was taken by the general agent on September 26, 1922 and then was sent by him to the Boston home office. At the same time the general agent forwarded money from his own funds sufficient to pay the first premium in advance. On September 29, 1922 the application was approved and accepted by the home office, and a policy for $10,000 made payable to the insured's estate was signed and issued by the plaintiff. The policy recited that the company "has signed and delivered this contract at Boston * * * this twenty-ninth day of September." This policy was mailed to the general agent at Indianapolis on October 2 and he in turn on October 5 turned it over to Olin. At the same time the insured paid the first annual premium of $317 to the general agent.

The policy provided that upon payment of the second annual premium and each year thereafter, any surplus made by the company "shall * * *, at the option of the Holder of the Policy, be * * * applied in reduction of premiums." The policy also contained an option for automatic premium loans which provided that after the payment of two annual premiums and upon the assignment to the company of the policy, "the Company will, until otherwise directed by the Insured, charge against the Policy as a premium loan, at six per cent interest, the amount of any premium (less the share of surplus apportioned thereto) which may thereafter become due and remain unpaid at the expiration of the period of grace; provided the cash value of the Policy and dividend additions, less any indebtedness to the Company hereon, including interest, shall equal or exceed the amount of such loan."

In his application the insured directed that the annual share of surplus be applied to reduce premiums. On October 30, 1926 the insured signed a "premium loan agreement" at Indianapolis which "hereby requested" the company to charge any due and unpaid premium against the policy as long as "the entire indebtedness on the Policy, with interest, shall not exceed the cash value," and which assigned as security all the "right, title and interest

in and to said Policy." This signed "premium loan agreement" was delivered to the general agent who in turn transmitted it to the home office at Boston. Thereafter from time to time the plaintiff made automatic loans for payment of premiums maturing on the policy, including the annual premium due on September 29, 1930. The aggregate of these premium loans, including interest to February 27, 1931, was $1,258.71.

The policy also contained an option for cash loans which provided that "At any time after three full annual premiums have been paid * * * the Holder hereof, * * * shall be entitled to a loan from the Company, on the sole security hereof, at six per cent interest, of a sum which * * * shall be equal to * * * the cash value of the Policy and of all dividend additions hereto * * * less any indebtedness to the Company hereon * * *. Failure to repay the loan, or to pay the interest thereon when due, shall not avoid the Policy while the total indebtedness hereon is less than the cash value."

About February 11, 1931 correspondence between the general agent at Indianapolis and the insured indicated that the insured was contemplating the surrender of his policy for its cash surrender value, but that the general agent advised him to borrow the policy's loan value (almost equal to the cash surrender value) which would enable him to keep his policy active at least until September 29, 1931. The insured followed this advice and on February 27, 1931 he signed and executed a "Policy Loan Agreement" which invoked the loan option clause of the policy above described. This "Policy Loan Agreement" stated that "Default in the payment of the loan shall be deemed to occur at the time when such total indebtedness and unpaid interest equal the loan value" and "It is agreed that * * * this contract * * * is made in the Commonwealth of Massachusetts and is to be governed and construed by the laws of said Commonwealth."

The loan agreement was executed and mailed to the general agent in Indianapolis who in turn mailed it to the Boston home office where it was received and approved. It evidenced a loan in the amount of $1,520 at 6% interest. From the loan of $1,520 was deducted the prior indebtedness on the policy (Premium Loans and interest thereon) amounting to $1,258.71

which left a balance of $261.29, the sum forwarded to the insured. On September 15, 1931 interest in the amount of $48.64 accrued on the policy loan and was added to the loan indebtedness, so that as of September 15, 1931 the total indebtedness chargeable against the policy amounted to $1,568.64.

Until September 29, 1931 nine premium payments had been made on the policy: $1,170 had been paid in cash and $1,683 had been paid by the use of automatic premium loans and the application of dividends (distributive shares of surplus) to the reduction of premiums. On September 1, 1931 the insured received a notice from the company which disclosed that the 1931 premium of $317 would accrue September 29 and that on that date he would have available as surplus credit an amount of $95.50. On September 3, 1931 the insured wrote to the general agent and enclosed in his letter the notice above described plus three notes aggregating $93. The general agent replied that "there will be a cash payment due of $128.50 on September 29th, 1931 [$95.50 surplus credit, $93 notes, and $128.50 cash]. This may be paid any time between now and October 29th, 1931. We will hold the notes awaiting receipt of cash payment." The insured failed to make the cash payment of $128.50, and the 1931 premium remained unpaid throughout the period of grace expiring October 30, 1931.

The policy provided that the premium of $317 was due on or before September 29 of every year and that the policy would lapse for failure to pay any such premium "when due or during the period of grace." On September 29, 1931 the 1931 premium of $317 matured. On that date there was a surplus credit of $95.50 in favor of the insured, the cash or loan value of the policy was $1,577.60, and the total indebtedness chargeable against the policy was $1,568.64 (or $1,572.30, if $3.66 interest from September 15, 1931 is added).

On October 30, 1931 the company at its Boston office applied an amount of $143.-70[1] as a partial payment of the 1931 premium. On November 27, 1931 the general agent wrote to the insured and informed him that the "Boston Office has written us as follows: 'Referring to Policy No. 460435, * * *, we have used the automatic premium loan feature to pay a portion of the 1931 premium in the amount of $143.70 and after deducting the share of surplus of $95.50 makes an automatic loan outstanding of $48.20. This will continue the Insurance in force until March 8, 1932, at which time the Policy will lapse without value.'" In this connection it is to be noted that in his application for insurance the insured requested that the surplus credit (dividends) be applied in reduction of premiums, and that the policy provided the "Company will, unless otherwise directed by the Insured, charge against the Policy as a premium loan * * * the amount of any premium (less the share of surplus apportioned thereto) which may * * * become due and remain unpaid at the expiration of the period of grace; provided the cash value * * * less any indebtedness * * * shall equal or exceed the amount of such loan."

On February 1 and 15 of 1932 the insured was notified that on March 8, 1932 the total indebtedness against the policy would equal the cash value, a circumstance which under the policy would compel its cancellation. On February 10, 1932 he was advised that an immediate cash payment of $131 would continue the policy in force until September 29, 1932. Then on April 8, 1932 the company mailed him the policy marked "cancelled" and explained to him that by nonpayment of the premium his policy had lapsed on March 8 without value. The record further disclosed that since April 8, 1932 the company had not received any communication from the insured, nor does it appear that he corresponded with the company after the September 3, 1931 letter and before April 8, 1932. On February 6, 1936 the insured died, on March 3, 1936 the defendant so notified the company, and on March

---

[1] The plaintiff computed the cash value of the policy as of March 8, 1932 to be $1,663.08; computed interest on the policy loan of $1,568.64 from September 15, 1931 to March 8, 1932 to be $44.97; computed interest on the automatic premium loan of $48.20 to March 8, 1932 to be $1.27 (the figure of $48.20 represents the difference between $1,663.08 and the indebtedness of $1,568.64, $44.97 and $1.-27). The plaintiff then applied the surplus of $95.50 reducing the unpaid premium and applied the automatic premium loan of $48.20, which made a total credit of $143.70.

5, 1936 the company denied all liability under the policy.

■ *Lex Loci.* In 1909 the Indiana legislature enacted a nonforfeiture statute which provided certain protection for the insured in case of forfeiture for default in payment of premiums.[2] Counsel disagree as to the applicability of this statute which forms a part of all life insurance policies "issued or delivered" in Indiana. Metropolitan Life Ins. Co. v. Winiger, Ind.Sup., 17 N.E.2d 86, 89. Counsel for plaintiff contends that the policy, the "automatic premium loan agreement" and the "policy loan agreement" are Massachusetts contracts and as such are controlled by Massachusetts law. The answer is given in the cases cited below.[3]

■ That the insurance policy in question when issued to Olin became an Indiana contract, subject to applicable Indiana statutes, is clear under the facts and circumstances already related here. Nothing more need be said.

■ The loan agreements represented conduct contemplated by the policy (the original contract) and subsidiary to it, and as such are governed by the applicable Indiana statutes. What was done by the company at its Boston office, constituted not the execution of Massachusetts contracts but the performance of acts under the original Indiana contract. Yet even if these agreements are treated as independent, the facts in the instant case ear-mark them as Indiana contracts. The acts essential to the making of these agreements involving the pledge of the policy were done by Olin and by the company's general agent in Indiana. Thus the loan applications and the agreements themselves were signed in Indiana, these papers plus the pledged policy were delivered at the Indiana office, and they were there received by the agent of the company doing business in Indiana.

■ Moreover, nothing was done by the company at its Boston office except to examine and file the loan papers and to make calculations and entries on these papers and on the company books. For instance, by the terms of the policy the company had already assented to making the loans. The several conditions attached had already been complied with; the essential acts were the applying for loans and the pledging of the policy, all done by the insured in Indiana. According to the policy, premium loans were to be made when a premium accrued and remained unpaid, "until otherwise directed by the Insured." The company in effect

2 Sec. 5, ch. 95, Acts 1909 (Burns' Ind. Stats.1933, § 39-801). No life insurance policy shall be "issued or delivered" in Indiana unless it provides the following:

Subsec. (7). A table of loan values and the cash, paid-up and extended insurance options.

Subsec. (9). Cash loans by the company, on the sole security of the policy, in a sum up to the loan value (stated in table of options) plus dividend additions less any existing indebtedness on the policy. Failure to repay any such loan or interest thereon, not to avoid the policy unless the total indebtedness to the company shall equal or exceed loan value.

Subsec. (10). Nonforfeiture of policy for default in payment of premiums. In case of such default "the insured shall be entitled to the extended insurance shown in the table of values and options * * * Provided, that * * * any existing indebtedness to the company * * * shall reduce the amount or term of such extended insurance in the ratio of such indebtedness to the net value of such extended insurance; and, Provided, That the policy may be surrendered * * * within one month from date of default for a specified cash value at least

equal to the sum which would otherwise be available for the purchase of extended insurance."

Section 6, ch. 95, Acts of 1909 (Burns' Ind.Stats.,1933, § 39-802). No life insurance policy shall be "issued or delivered" in Indiana, if it contains the following:

Subsec. (3). A pre-maturity (of policy) settlement whereby the insured obtains less value than the amount insured under the policy plus dividend additions and less indebtedness to the company.

Subsec. (4). Forfeiture for failure to repay a policy loan or interest thereon, while the total indebtedness on the policy is less than the loan value.

3 Equitable Life Assur. Society v. Clements, 140 U.S. 226, 11 S.Ct. 822, 35 L.Ed. 497; Allgeyer v. Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832; Northwestern Life Ins. Co. v. McCue, 223 U.S. 234, 32 S.Ct. 220, 56 L.Ed. 419, 38 L. R.A.,N.S., 57; New York Life Ins. Co. v. Head, 234 U.S. 149, 34 S.Ct. 879, 58 L. Ed. 1259; New York Life Ins. Co. v. Dodge, 246 U.S. 357, 38 S.Ct. 337, 62 L.Ed. 772, Ann.Cas.1918E, 593; Mutual Life Ins. Co. v. Liebing, 259 U.S. 209, 42 S.Ct. 467, 66 L.Ed. 900.

promised to make policy loans upon certain conditions complied with by the insured. Certainly the acts done by the company at its Boston office upon receiving the loan papers did not call for the exercise of discretion. Mutual Life Ins. Co. v. Liebing, 259 U.S. 209, 42 S.Ct. 467, 66 L.Ed. 900.

In Equitable Life Assur. Society v. Clements, 140 U.S. 226, 11 S.Ct. 822, 35 L. Ed. 497, the application for insurance was considered and accepted in the state where the company's home office was located; the policy was executed there and it provided that the premiums should be payable there. Yet such acts did not prevent the policy from being held a contract made in the state wherein the insured resided. In the instant case the acts done by the company at its Boston office, in connection with the loan agreements, are similar in character. The same conclusion should follow: the functions done by the company at its Boston office were acts performed under Indiana contracts.

█ It is true the loan agreement recited that "this contract * * * is made in the Commonwealth of Massachusetts and is to be governed and construed by the laws of said Commonwealth," but this provision does not affect the result reached above. The law is well settled that provisions in contracts for incorporating the laws of a particular state are inoperative, when the law agreed upon is inconsistent with the law of the state in which the contract is actually made. Mutual Ins. Co. v. Hill, 193 U.S. 551, 24 S.Ct. 538, 48 L.Ed. 788; Supreme Lodge Knights of Pythias v. Meyer, 198 U.S. 508, 25 S.Ct. 754, 49 L.Ed. 1146; Keeley v. Mutual Life Ins. Co., 7 Cir., 113 F.2d 633, decided July 3, 1940. Where the question is one of ascertaining the place in which a contract is made, the facts and circumstances alone are essential.

█ On these facts, even if the rules of law ordinarily applied in ascertaining the place of contract compelled us to hold that the loan agreements were made in Massachusetts, it would not follow logically that the regulatory insurance statute of Indiana is inapplicable. Legislation regulating insurance falls properly within the exercise of the state police power. The insurance here regulated involves contracts made by a citizen and resident of the state and by a foreign corporation doing business there and knowing of the existence of the statute. The record shows that physically every act done by the insured in connection with the insurance was done within the state, and that many of the acts done by the corporation were done there through its general agent. We do not believe the state legislation is unconstitutional which refuses to permit the courts of the state to give to such acts done within the state the effect of nullifying the legislative provisions deemed by the legislature necessary for the public welfare, nor do the Head and Allgeyer cases, supra, compel a different belief in this matter.

█ *Default by Nonpayment of Premiums.* The payment of premiums is entirely optional with the insured: he may continue the policy by meeting his premium obligations or he may cause it to lapse for nonpayment of premiums. If he ceases to pay, the policy lapses and the insured has no further claim except such as the nonforfeiture clauses of the policy (or the nonforfeiture statute, if they are inconsistent) may give. Nonforfeiture privileges, contractual or statutory, are for the benefit of the insured and the right thereto is based on the existence of a reserve value. Where a policy has no reserve value, however, the nonforfeiture privileges are inapplicable. As expressed by the Indiana Appellate Court, "There was nothing with which to purchase paid-up insurance or extended insurance. Having accepted the full reserve value of the policy in the form of a loan and accumulated interest, he certainly was not in a position to demand more." Reserve Loan Life Ins. Co. v. Brammer, 83 Ind.App. 584, 146 N.E. 876, 878.

In the instant case counsel for the plaintiff contends that the policy did not lapse for default in the payment of premiums until March 8, 1932. He argues that at that time the policy terminated rather than lapsed into extended insurance because there was then no reserve with which to purchase extended insurance. If the default occurred on March 8, 1932, counsel's argument is sound. Bronson v. Northwestern Mutual Life Ins. Co., 75 Ind.App. 39, 129 N.E. 636; Brammer case, supra; Metropolitan Life Ins. Co. v. Winiger, Ind. Sup. 17 N.E.2d 86. On the other hand the defendant contends that the policy lapsed into extended insurance on September 29, 1931 for default in the payment of premiums. On this date there was a reserve with which to purchase the extended insurance requested by the insured under the policy and to which he was entitled under

the statute. The immediate question then goes to the legality of the company's action on October 30, 1931, when it continued the policy until March 3, 1932 by applying the surplus credit and a premium loan in partial payment of the 1931 premium.

The policy provided that a premium of $317 was due on or before September 29 of every year and that the policy would lapse for failure to pay such premium "when due or during the period of grace." Until 1931 the premiums had been paid on an annual basis by the payment of cash and the application of dividends and automatic premium loans. Nor does the correspondence between the insured and the company in September of 1931 indicate an agreement that the 1931 premium be paid on a basis other than the annual basis. The correspondence shows that the company sent the insured a notice declaring the accrual of the tenth annual premium of $317 on September° 29, 1931 and advising him how he might meet that premium by October 30, 1931. This the insured failed to do and the 1931 premium of $317 was never paid.

The policy and premium loan agreement required the company to charge against the policy as a premium loan "the amount of any premium (less the share of surplus apportioned thereto)" remaining unpaid, when there was a cash reserve sufficient for that purpose. The cash reserve on October 30, 1931 was not sufficient to equal the unpaid premium less the surplus credit. Plaintiff points to the case of Massachusetts Mut. Life Ins. Co. v. Jones, 4 Cir., 44 F.2d 540, 541, where a premium loan was made in an amount sufficient to continue the policy for a quarter of a year. In that case, however, the premium loan agreement provided that the company would loan the "amount of the unpaid premium, or the largest installment of premium, not less than a quarter year, which the cash value * * * less any indebtedness, was sufficient for."

In his application for insurance the insured requested that the premiums be reduced by available surplus credit. Yet the insurer's application of the dividend in reduction of the premium which is due will not continue the policy in force after the expiration of the grace period, unless the balance of the premium is paid prior to the latter date. In other words the application of the surplus credit in reduction of the premium does not effect partial payment but only indicates a credit of the dividend on the premium, subject to the timely payment by the insured of the balance of the accrued premium. Bronson case, supra. It follows from all this that the company's action on October 30, 1931 violated the terms of the policy and that therefore the policy lapsed into extended insurance as of September 29, 1931 for default in payment of premiums.

*Computation of Extended Insurance.* Counsel for the defendant contends that the indebtedness chargeable against the policy at the time of default in premium payments does not affect the insured's right to extended insurance. He places undue reliance on the cases of Waddell v. New England Mutual Life Ins. Co., 83 Ind.App. 209, 147 N.E. 816, and Equitable Life Ins. Co. v. Taylor, 106 Ind.App. 508, 17 N.E.2d 851. The following cases are also important: Brammer case, supra, and Metropolitan Life Ins. Co. v. Winiger, Ind.App., 12 N.E. 2d 1008; Id., Ind.Sup., 17 N.E.2d 86. Our analysis of these cases construing the Indiana statute, and our construction of the policy in question, lead us to conclude adversely.

At the time the policy lapsed into extended insurance, the cash or loan value, i. e., the unreduced reserve value, was $1,577.60 and the total indebtedness chargeable against the policy was $1,568.64. Counsel for the defendant contends that the gross reserve value of $1,577.60 was available for computing the extended insurance to which the insured was entitled. He places great emphasis on the particular language of the extended insurance option which provides extended insurance "for its face amount, including any additions, and less any indebtedness hereon, for such time as the then cash value, together with any share of surplus held at interest, will purchase as a net single premium." This provision must be construed in connection with its context. In fact the entire contract must be interpreted with regard to the evident purposes of the parties and the nature of the general undertakings of the insurer toward its policy holders.

Viewed in its entirety the insurance contract in question contemplates the appropriation for extended insurance purposes of only so much of the reserve value as remains after deducting the debt to the insurer. Thus the loan clauses of the policy state that the cash loans and the premium loans made by the company constitute a

lien against the policy and reduce the reserve value pro rata. Furthermore the "Table of Loan, Cash, Paid-up and Extended Insurance Values" clause provides that the reserve values will be reduced by any indebtedness chargeable against the policy. In addition, had the insured elected to exercise the cash surrender value option, he would have received an amount equal to the difference between the reserve value and the indebtedness. It follows that this amount, the net or reduced reserve value, and no more, was the sum available for the exercise of the other options under the policy.

When, therefore, the policy lapsed into extended insurance on September 29, 1931, the indebtedness chargeable against the policy was deductible both from the face of the policy and from the available reserve value. Such a construction of the policy is sound, consistent with settled insurance practices, and manifestly fair to both parties. It gives to the insured what the statute would secure for him, namely, the reserve value. He may borrow it for the payment of premiums (premium loans) or for other purposes (cash loans). He may cause the policy to lapse and apply it to the purchase of extended term or paid-up insurance. He ·may surrender his policy and claim it in the form of cash surrender value. It is for his benefit and he may do with it as he wills, but he can not use it up and have it too. In this regard the policy gives to the insurer what the statute would not take from him, namely, protection against paying out the reserves twice.

 Nor is there anything in the statute which would make available for extended insurance computation the gross or unreduced reserve value of the policy. On the contrary the statute, as does the policy, contemplates that a net reserve value will be applied in the computation of extended insurance. See footnote 2. Furthermore an analysis of the cases grouped above leads to the same conclusion. These are Indiana Appellate cases except Metropolitan Life Ins. Co. v. Winiger, Ind.Sup., 17 N.E.2d 86. In that case the policy provided that on default the indebtedness would be deducted from the reserve value, and the net reserve value was used for extended insurance purposes. The Indiana Supreme Court approved of this method, saying (page 89 of 17 N.E.2d): "The provisions of the policy are valid and in accordance with the requirements of the statute * * *."

But it must be observed that the statute does not permit the indebtedness to reduce both the amount and term of extended insurance. Cf. amendment to Sec. 5, Subsec. (10) in 1925; Burns' Ind.Stats. (1933), § 39-801. The statute grants two options: (1) the indebtedness shall reduce the amount of the extended insurance in the ratio of such indebtedness to the net value of such extended insurance; or (2) such indebtedness shall reduce the term of such extended insurance. Option (1) would entitle the insured to extended insurance in the amount of less than $100 and for a term of 11 years, 178 days. Option (2) would entitle the insured to extended insurance in the amount of $10,000 and for a term of less than one year. See Winiger case, 17 N.E.2d pages 88, 89.

 The insurance company is permitted to designate which of the two options shall be incorporated in the policy. In the Winiger case the policy provided that on default the indebtedness would be deducted from the reserve value and such indebtedness would also reduce the amount of extended insurance. The Indiana Supreme Court concluded that this provision indicated that the company had chosen the first option. Now in our case it has been shown that the policy provided that the amount of the indebtedness was deductible both from the face of the policy and from the available reserve value, in the computation of extended insurance. According to the Indiana Supreme Court, this indicated that the company had chosen the first option, and so we conclude.

In the Winiger case the insurance company arrived at the amount of extended insurance by applying the net reserve value (the reserve value less the indebtedness chargeable against the policy) and finding out how much term insurance that sum would purchase. Since this method of settlement ($195) approximated the statutory settlement ($194.92), the Indiana Supreme Court concluded that the contractual settlement met the requirements of the statute. Of course, if the contractual settlement had produced an amount substantially lower than what the statutory settlement secured for the insured, the latter settlement would have prevailed.

 We conclude therefore that the company in the instant case sufficiently indicated

that the indebtedness was to be used to reduce the amount of extended insurance and not the term; that it may compute this amount by finding what the reserve value less the total indebtedness chargeable against the policy will purchase; that this method of settlement is binding on the parties, unless the statutory method of settlement (i e., option 1; see Metropolitan Life Ins. Co. v. Winiger, Ind.Sup., 17 N.E.2d 86, 88, 89) is more favorable to the insured; and that to the amount computed shall be added the share of surplus standing to the credit of the policy on September 29, 1931 and the share of surplus thereafter apportioned to such extended insurance, with interest thereon from the time the same should have been paid.

The judgment of the District Court is reversed and the cause is remanded for further proceedings in conformity with the opinion.